AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| INFORMATION ASSOCIATED WITH FOUR ACCOUNTS | ) |
| STORED AT PREMISES CONTROLLED BY THREE PROVIDERS | ) |
| PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF | ) |
| VIOLATION OF 18 U.S.C. § 2252(a)(2) AND (a)(4) | ) |

Case No.  25-SC-1460

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachments A-1, A-2, and A-3 (incorporated by reference)

Located within the jurisdiction of the District of Columbia, there is now concealed  *(identify the person or describe the property to be seized)*:

See Attachments B-1, B-2, and B-3 (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252(a)(2) (Distribution of Child Pornography);  18 U.S.C. § 2422(a)(4) (Possession of Child Pornography). | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Blake Frohnapfel, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone_____ *(specify reliable electronic means).*

Date:     8/29/2025

_____
*Judge's signature*

City and state:     Washington, D.C.

G. Michael Harvey
(United States Magistrate Judge)

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No.  25-SC-1460 |
| INFORMATION ASSOCIATED WITH FOUR ACCOUNTS | ) |
| STORED AT PREMISES CONTROLLED BY THREE PROVIDERS | ) |
| PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF | ) |
| VIOLATION OF 18 U.S.C. § 2252(a)(2) AND (a)(4) | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

      An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located within the jurisdiction of the District of Columbia.
*(identify the person or describe the property to be searched and give its location)*:

  See Attachments  A-1, A-2, and A-3 (incorporated by reference).

      I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

  See Attachments  B-1, B-2, and B-3 (incorporated by reference).

      **YOU ARE COMMANDED** to execute this warrant on or before _____September 12, 2025_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

      Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

      The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____G. Michael Harvey_____ .
                                                                *(United States Magistrate Judge)*

      ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
     ☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____8/29/2025_____      _____

                                                                        *Judge's signature*

City and state: _____Washington, D.C._____      _____G. Michael Harvey_____
                                                               United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>25-SC-1460 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____                     _____
                                                                            *Executing officer's signature*

                                                                            _____
                                                                            *Printed name and title*

**<u>ATTACHMENT A-1</u>**
**Property to Be Searched**


This warrant applies to information associated with the iCloud account **vicstoy@aol.com** (the TARGET ACCOUNT) that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at One Apple Park Way, Cupertino, California.

**ATTACHMENT B-1**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

**I.      Information to be Disclosed by Apple Inc.**

To the extent that the information described in Attachment A is within the possession,

custody, or control of Apple Inc. ("Apple"), regardless of whether such information is located

within or outside of the United States, including any messages, records, files, logs, or information

that have been deleted but are still available to Apple, Apple is required to disclose the following

information to the government, in unencrypted form whenever available, for the account described

in Attachment A:

a.      All records or other information regarding the identification of the accounts, to
include full name, physical address, telephone numbers, email addresses (including primary,
alternate, rescue, and notification email addresses, and verification information for each email
address), the date on which the accounts were created, the length of service, the IP address used to
register the accounts, account status, associated devices, methods of connecting, and means and
source of payment (including any credit or bank account numbers);

b.      All records or other information regarding the devices associated with, or used in
connection with, the accounts (including all current and past trusted or authorized iOS devices and
computers, and any devices used to access Apple services), including serial numbers, Unique
Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers
("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers
("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"),
Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber
Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers
("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile
Station Equipment Identities ("IMEI");

c.      For data backed up to iCloud between account creation to the present: The contents
of all emails associated with the accounts including stored or preserved copies of emails sent to
and from the accounts (including all draft emails and deleted emails), the source and destination
addresses associated with each email, the date and time at which each email was sent, the size and
length of each email, and the true and accurate header information including the actual IP addresses
of the sender and the recipient of the emails, and all attachments;

d.      For data backed up to iCloud between account creation to the present: the contents
of all instant messages associated with the accounts, including stored or preserved copies of instant

messages (including iMessages, SMS messages, and MMS messages) sent to and from the accounts (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.     For data backed up to iCloud between account creation to the present: the contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.     For data backed up to iCloud between account creation to the present: all activity, connection, and transactional logs for the accounts (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g.     For data backed up to iCloud between account creation to the present: all records and information regarding locations where the accounts or devices associated with the accounts were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h.     All records pertaining to the types of service used;

i.     All records pertaining to communications between Apple and any person regarding the accounts, including contacts with support services and records of actions taken; and

j.     All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information

set forth above to the following:

Special Agent Blake Frohnapfel
Federal Bureau of Investigation
BFrohnapfel@fbi.gov

PROVIDER is specifically authorized to transmit or send the information specified below to the Metropolitan Police Department and Federal Bureau of Investigation in the United States, including, but not limited to, Washington, D.C.

## II.    Information to be Seized by the Government

All information uploaded to the TARGET ACCOUNT between November 1, 2019, and the present date described above in Section I that constitutes fruits, contraband, evidence, instrumentalities, and information relating to violations of Distribution of Child Pornography, 18 U.S.C. § 2252(a)(2), and Possession of Child Pornography 18 U.S.C. § 2422(a)(4) (the "TARGET OFFENSES") that have been committed by Victor Blythe (Blythe or SUBJECT) and other identified and unidentified persons between November 1, 2019 and the present, as described in the affidavit submitted in support of this warrant, including, for the account described in Attachment A, information including any stored electronic data, that contains, constitutes evidence of, documents, establishes, identifies, or reflects the TARGET OFFENSES, including:

A.    the identity of the person who created or used, and continue to use, the account, including records that help reveal the whereabouts of such person;

B.    how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the TARGET OFFENSES and to the account user;

C.    the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the TARGET OFFENSES; or (ii) communicated with the account about matters relating to the TARGET OFFENSES, including the contents of their communications and records that help reveal their whereabouts;

D.    the SUBJECT'S state of mind (*e.g.*, intent, absence of mistake) or preparation, planning, knowledge, and experience, related to the TARGET OFFENSES;

E.    the commission of the TARGET OFFENSES;

F.    locations where the SUBJECT committed the TARGET OFFENSES, and traveled to before and after the commission of the TARGET OFFENSES, including in preparation for the TARGET OFFENSES;

G.    meetings and communications between the SUBJECT and other individuals discussing the commission of the TARGET OFFENSES;

H.    evidence of the SUBJECT engaged in the distribution, possession, production,

receipt, and/or transportation of child pornography.

I.      Evidence of the SUBJECT engaging in the enticement and/or coercion of minors to engage in criminal sexual acts.

J.      Communications relating to the sexual exploitation of minors.

K.      Information, records, or communications relating to financial transactions made in exchange for sexually explicit images.

### III.    Government Procedures for Warrant Execution

The United States government will conduct a search of the information produced by Apple and determine which information is within the scope of the information to be seized specified above in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information provided by Apple that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

## ATTACHMENT A-2
### Property to Be Searched

This warrant applies to information which is associated with the **Google LLC** account identified by **victorblythe1@gmail.com** (the TARGET ACCOUNT) which are stored at premises owned, maintained, controlled, or operated by Google LLC, a company that is headquartered at / accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, California.

## ATTACHMENT B-2

### Particular Things to be Seized and Procedures
### to Facilitate Execution of the Warrant

**I.     Information to be disclosed by Google LLC ("PROVIDER") to facilitate execution of the warrant**

To the extent that the information described in Attachment A is within the possession, custody, or control of PROVIDER, including any records that have been deleted but are still available to PROVIDER, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), PROVIDER is required to disclose the following information to the government corresponding to each account or identifier ("Account") listed in Attachment A:

a.     For the time period November 1, 2019, to the present: The contents of all communications and related transactional records for all PROVIDER services used by an Account subscriber/user (such as email services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services (Google Drive), electronic communication services such as Gmail (electronic mail), Google Voice (voice calls, voicemail, and SMS text messaging), Chat (instant messaging and video chats, previously called Hangouts), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting

on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); Android (operating system); and Google Play (which allow users to purchase and download digital content, e.g., applications).

b.      For the time period November 1, 2019, to the present: The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as email services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services GOOGLE DRIVE, INCLUDING ALL SERVICES REFERENCED IN PARAGRAPH (a)., including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.      For the time period November 1, 2019, to the present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.      For the time period November 1, 2019, to the present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

e.      All records regarding identification of the Account, including names, addresses, telephone numbers, alternative email addresses provided during registration, means and source of

payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

f.    All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (Google Cloud Messaging ("GCM"));

g.    Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common email address (such as a common recovery email address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

h.     For the time period January 1, 2023, to the present: All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i.     For the time period from November 1, 2019, to the present: All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

j.     Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above to the following:

Special Agent Blake Frohnapfel
Federal Bureau of Investigation
BFrohnapfel@fbi.gov

PROVIDER is specifically authorized to transmit or send the information specified below to the Metropolitan Police Department and Federal Bureau of Investigation in the United States, including, but not limited to, Washington, D.C.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of Distribution of Child Pornography, 18 U.S.C. § 2252(a)(2), and Possession of Child Pornography 18 U.S.C. § 2422(a)(4) (the "TARGET OFFENSES") that have been committed by Victor Blythe (Blythe or SUBJECT) and other identified and unidentified persons between November 1, 2019 and the present, as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(a)   Information that constitutes evidence of the identification or location of the user(s) of the Account;

(b)   Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(c)   Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(d)   Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(e)   Communications related to the sexual exploitation of children;

(f)  Child pornography;

(g)  Child erotica;

(h)  Information that constitutes evidence concerning the distribution, possession, receipt, and/or transportation of child pornography; and

(i)  Information and records that indicate and prove that the account subscriber is intentionally engaged in the distribution, possession, receipt, and/or transportation of child pornography.

**III.    Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed

**<u>ATTACHMENT A-3</u>**
**Property to Be Searched**

This warrant applies to information associated with e-mail accounts **vicstoy@aol.com**

and **vrblythe@aol.com** (the TARGET ACCOUNTS), that is stored at premises owned,

maintained, controlled, or operated by **Yahoo Inc.**, a company that accepts legal process at 770

Broadway, 9th Floor, New York, NY 10003-9562.

**ATTACHMENT B-3**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

**I.    Information to be disclosed by Yahoo Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on June 8, 2020 and again on August 31, 2020, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

1.    From November 1, 2019, to the present: the contents of all emails associated with the account**,** including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

2.    For the time period from November 1, 2019, to the present: The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as email services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services), including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

3.      For the time period from November 1, 2019, to the present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

4.      For the time period from November 1, 2019, to the present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

5.      All records regarding identification of the Account, including names, addresses, telephone numbers, alternative email addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

6.      All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and

similar technologies, and any other unique identifiers that would assist in identifying any such device(s) including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN") and Google Cloud Messaging ("GCM"));

7.      Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common email address (such as a common recovery email address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar technologies, or any other unique device or user identifier;

8.      For the time period from November 1, 2019, to the present: All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

9.      For the time period from November 1, 2019, to the present: All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken;

10.     Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth

above to the following:

> Agent Blake Frohnapfel
> Federal Bureau of Investigation
> BFrohnapfel@fbi.gov

> PROVIDER is specifically authorized to transmit or send the information specified below

to the Metropolitan Police Department and Federal Bureau of Investigation in the United States,

including, but not limited to, Washington, D.C.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of Distribution of Child Pornography, 18 U.S.C. § 2252(a)(2), and Possession of Child Pornography 18 U.S.C. § 2422(a)(4) (the "TARGET OFFENSES") that have been committed by Victor Blythe (Blythe or SUBJECT) and other identified and unidentified persons between November 1, 2019 and the present, as described in the affidavit submitted in support of this Warrant, including, for each Account, information pertaining to the following matters:

(j)  Information that constitutes evidence of the identification or location of the user(s) of the Account;

(k)  Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

(l)  Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(m) Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

(n)  Communications related to the sexual exploitation of children;

(o) Child pornography;

(p) Child erotica;

(q) Information that constitutes evidence concerning the distribution, possession, receipt, and/or transportation of child pornography; and

(r) Information and records that indicate and prove that the account subscriber is intentionally engaged in the distribution, possession, receipt, and/or transportation of child pornography.

### III.    Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FOUR ACCOUNTS STORED AT PREMISES CONTROLLED BY THREE PROVIDERS PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 2252(a)(2) AND (a)(4)** | SC No. <u>25-SC-1460</u> |

*Reference:    USAO Ref. # 2025R01108; Subject Accounts: vicstoy@aol.com; vrblythe@aol.com; victorblythe1@gmail.com; iCloud account associated with vicstoy@aol.com*

**AFFIDAVIT IN SUPPORT OF
<u>AN APPLICATION FOR A SEARCH WARRANT</u>**

I, Blake Frohnapfel, being first duly sworn, hereby depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1.      I make this affidavit in support of an application for a search warrant for information associated with the following four accounts (collectively, the TARGET ACCOUNTS):

| Accounts | | Provider |
|---|---|---|
| Apple Account:      vicstoy@aol.com | | Apple Inc. |
| Gmail Account:      victorblythe1@gmail.com | | Google LLC |
| Yahoo Accounts:      vicstoy@aol.com; vrblythe@aol.com | | Yahoo Inc. |

The information is stored at premises controlled by the providers, each of which is an electronic communications services provider and/or remote computing services provider (collectively "PROVIDERS"). The providers are headquartered at / accept service at:

| Provider | Address |
|----------|---------|
| Apple Inc. | One Apple Park Way, Cupertino, California |
| Google LLC | 1600 Amphitheatre Parkway, Mountain View, California |
| Yahoo Inc. | 1199 Coleman Avenue, San Jose, California |

2.      The information to be searched is described in the following paragraphs and in Attachments A-1 through A-3.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require each PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachments B-1 through B-3.  Upon receipt of the information described in Section I of Attachments B-1 through B-3, government-authorized persons will review that information to locate the items described in Section II of Attachments B-1 through B-3, using the procedures described in Section III of those attachments.

3.      I am a special agent with the Federal Bureau of Investigation, and I have been so employed since 2021.  I am currently assigned to the Washington Field Office (WFO) Child Exploitation and Human Trafficking Task Force (CEHTTF) and investigate violations involving child pornography, the sexual exploitation of children and related offenses.  I have training and experience in the enforcement of the laws of the United States, including the preparation and presentation of search warrant affidavits and in conducting search warrants.  I have had both training and experience in the investigation of crimes involving electronic media and have worked with other FBI agents who have such experience, and who have provided me with additional information about such crimes.  As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of Distribution of Child Pornography, 18 U.S.C. § 2252(a)(2) and Possession of Child Pornography, 18 U.S.C. § 2252(a)(4) (the "TARGET OFFENSES") have been committed by Victor Blythe. There is also probable cause to search the information described in Attachments A-1 through A-3 for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachments B-1 through B-3.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below,

acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C. *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

6.      C.D.[1] is the subject of a Fairfax County Police Department ("FCPD") investigation related to alleged sexual abuse of potentially four minor victims.  FCPD executed search warrants for C.D.'s residence and office, during which FCPD seized and searched C.D.'s cellular telephone.

7.      The search of C.D.'s cellular telephone resulted in the identification of text messages between C.D. and telephone number 202-276-XXXX, who was identified in C.D.'s cellular telephone as "Victor Blythe," hereinafter the "SUBJECT."

### *Text Messages*

8.      Between August 8, 2019, and July 20, 2025, the SUBJECT exchanged text messages with C.D., while the SUBJECT used telephone number 202-276-XXXX.  During these text exchanges, among other topics, the SUBJECT and C.D. frequently described their sexual preferences for minors and discussed the content of attachments and Mega links[2] that C.D. sent to the SUBJECT.  The SUBJECT also used e-mail account vicstoy@icloud.com to communicate via iMessage with C.D.  The attachments that C.D. and the SUBJECT exchanged were not visible in the extraction of C.D.'s cellular telephone because C.D. had deleted the text exchange prior to law enforcement extracting the phone.

---

[1] I am aware of C.D.'s identity based on information provided to me by the Fairfax County Police Department.

[2] Mega is a file hosting service located in New Zealand.  Persons who collect child pornography are known to store child pornography on Mega and to share with one another links to folders containing child pornography.

9.      For example, within text messages dated August 8, 2019, C.D. described an

interaction C.D. had with a 13-year-old male, as further described below:

C.D.: [*Sends unknown attachment*]
SUBJECT: What's this?
C.D.: This 13 year old and I chatted for 90 minutes in Starbucks
C.D.: he says he's straight
C.D.: but his dick is 5 inches long
C.D.: He hit puberty when he was 11
C.D.: He masturbates 3 times a day
C.D.: Yes. I was having these conversations with him in a public Starbucks
C.D.: I said to him…"I wouldn't tell your parents about this conversation if I were you."
C.D.: He said…oh, no, they would assume you're a child predator…you're not right?"
C.D.: then we talked about [name of local spa]
C.D.: Being naked there
C.D.: He said he would love to go there
C.D.: I told him they'd love him there and why…
C.D.: Blah Blah – then I opened into whether he shaves his balls
C.D.: Each line of questions I pushed into something sexual
C.D.: He opened up more and more
C.D.: He messaged me this morning and said he was uncomfortable with our conversation yesterday and doesn't want to talk to me again…haha – looks like he spoke to a friend or his parents…and they told him to cut it off immediately…
C.D.: And then he blocked me on Snapchat
C.D.: That's ok. That was a fantasy that I got to enjoy- and now it's done – I can get back to focusing on work
SUBJECT: Good point
SUBJECT: You got about as far as you could have gotten given the circumstances
C.D.: I know where he lives though
C.D.: Not that I'll do anything – but it seems he' smore comfy talking in person…so if I run into him again? I'll regrill him and see what happened…
SUBJECT: Do you know his address?
C.D.: Yep
C.D.: Found him on public record
C.D.: He said he bikes to Starbucks daily
SUBJECT: Well, you should go to that Starbucks again and kind of wait for him.
C.D.: Maybe after he comes back from camp
C.D.: Regardless – it was a wonderful conversation
SUBJECT: It sounds like it was an amazing conversation and you should be very thankful that you had the opportunity to enjoy it. *Most people who have desires like you and me would never have been able to do what you did.* [emphasis added]

10.     A few weeks later, within text messages dated August 22, 2019, C.D. sent an

attachment to the SUBJECT to which the SUBJECT responded by inquiring about the previously

discussed 13-year-old, as further described below:

> C.D.: [*Sends unknown attachment*]
> SUBJECT: Friend of yours?
> C.D.: Nice pic huh?
> SUBJECT: Yeah.
> SUBJECT: Friend of yours?
> C.D.: Wishful thinking
> C.D.: Who took the photo I wonder?
> SUBJECT: Their father took the photo.
> SUBJECT: Did you ever hear from that 13 year old?
> C.D.: Nope
> SUBJECT: How does that make you feel?
> C.D.:  How does that make YOU feel?
> SUBJECT:  I'd love to video tape you fucking a 12 year old.
> C.D.: Uh huh
> SUBJECT: How does that make you feel?

11.     Two days later, within text messages dated August 24, 2019, C.D. sent the

SUBJECT a series of messages which included attachments.  The SUBJECT and C.D. shared the

following text messages:

> C.D.: [*Sends five messages containing unknown attachments*]
> C.D.: Watching a movie
> SUBJECT: At home?
> C.D.: Nope
> SUBJECT: What movie?
> SUBJECT: Porn?

12.     The texts dated August 26, 2019, through August 27, 2019, continued between

SUBJECT and C.D.:

> C.D.: [*Sends unknown attachment*]
> SUBJECT: How old?
> C.D.: What do you think?
> SUBJECT: Hard to tell because the crotch is shaven
> SUBJECT:  I'm going to guess anywhere between 14 to 19.
> C.D.: 14
> SUBJECT: How do you know?

C.D.: Cause he told me
C.D.: *[Sends unknown attachment]*
SUBJECT: How does that make you FEEL?
SUBJECT: He looks like your son!
C.D.: Does he look 14?
SUBJECT: Yes
SUBJECT: What do you want to do with him?
C.D.: We'll see
SUBJECT: Are you talking to him?
C.D.: Yep
C.D.: We're doing a video chat tonight
SUBJECT: Did you meet him on Grindr?
C.D.: [*Sends unknown attachment*]
SUJBECT: Nice
SUBJECT: Does he wear girls clothing?
C.D.: Only in photos
C.D.: Not in person
SUBJECT: How do you know?
C.D.: He told me?
SUBJECT: Are you excited?
C.D.: I'm cautious
SUBJECT: You should be!

13.     On text messages dated September 10, 2019, C.D. sent additional attachments via

text message to the SUBJECT that read in part:

C.D.: [*Sends two consecutive text messages containing unknown attachments*]
SUBJECT*:* Who is that?
C.D.: Just a pic
C.D.: Hot huh
SUBJECT: Yeah.
C.D.: How old?
SUBJECT: Approximately 13 or 14.
C.D.: It's absolutely stunning

14.     Similarly to the text messages dated September 10, 2019, on text messages dated

September 13, 2024, C.D.'s sent additional attachments via text to the SUBJECT:

C.D.: [*Sends two consecutive text messages containing unknown attachments*]
*C.D.:* Some nice things to wake up to
SUBJECT: How did you get these?
C.D.: Gayboystube.com freely posted
SUBJECT: Nice!
C.D.: They're all posted on my wall under XXXX

C.D.: Look me up
SUBJECT: Ok

15.      On text messages dated October 2, 2019, the SUBJECT and C.D. exchanged the

following text messages:

C.D.: Want me to send you some naughty photos?
SUBJECT: Of course!
C.D.: They're young
C.D.: Are you in a secure location
SUBJECT: Very secure location. I'm in my car.
C.D.: [*Sends unknown attachment*]
SUBJECT: That was great!
SUBJECT: Thank you!
SUBJECT: Who sent you that?
C.D.: Call me
C.D.: Mega

16.      On text messages dated November 8, 2019, C.D. and SUBJECT sent an

attachment to C.D. as the two discussed C.D.'s recent date with a woman:

SUBJECT: I'm 55, and it can be really difficult to maintain an erection with someone,
even a hot 12 year old on the cusp of puberty! [*winking emoji*]
SUBJECT: [*sends unknown attachment*]
C.D.: Old photo
C.D.: Which I sent to you
SUBJECT: I know! [*winking emoji*]
SUBJECT: Thought I'd give you a little inspiration.

17.      On text messages dated November 9, 2019, SUBJECT and C.D. discussed C.D.'s

stepson:[3]

SUBJECT: You need to focus on developing the sort of relationship with [stepson] that
you ultimately want with him. He is getting older and your window with him as a child
and a young teenager is a very small window.
C.D.: Behave
C.D.: Not happening with [stepson]
SUBJECT: Stop reading into things.

---

[3] Although C.D.'s charges include sexual abuse against his stepdaughters, Virginia authorities have not
charged any conduct related to his stepson.

18.    On text messages dated November 23, 2019, C.D. sent additional attachments to

the SUBJECT, that read as follows:

C.D.: [*Sends four consecutive messages containing unknown attachments*]
SUBJECT: Who is that?

19.    On text messages dated February 20, 2020, the SUBJECT inquired about items

sent via Mega, as described below:

SUBJECT:  Did you just send me something at Mega?
C.D.: Yep
SUBJECT: Cool!
SUBJECT: Please don't send me female or girls. I'm not interested in them. I'm ONLY
interested in boys. Thanks!
C.D.: Haha
C.D.: Ok

20.    The conversation continued between the SUBJECT and C.D on text messages

dated March 3, 2020, described below:

C.D.: Sent you lots of really really good ones
SUBJECT: Ok. Thanks.
C.D.: Enjoy watching those?
SUBJECT: I haven't had a chance to see them yet, but I'm sure they are good.
C.D.: I've wanked 8 times tonight
SUBJECT: Oh my god!
C.D.: About to watch a few more before shutting off the lights
SUBJECT: The videos were AMAZING!!! What were your favorites?
C.D.: You watched them all?
SUBJECT: Just about!
SUBJECT: And jacked off to them, too!

21.    On text messages dated March 27, 2020, C.D. and the SUBJECT discussed

additional attachments C.D. shared to the SUBJECT via text message:

C.D.: [*Sends three unknown attachments*]
C.D.: I've cum 6 times this morning
C.D.: Another 6 just last night
SUBJECT: Amazing!
SUBJECT: Did you hook up with the boy?
C.D.: Nope

C.D.: His dad came home

22.     Within text messages dated May 8, 2020, the SUBJECT inquired whether C.D.

shared additional files via Mega:

> SUBJECT: Did you send me a couple of files over the last few days on Mega?
> C.D.: Yep
> SUBJET: Good. Just checking. Always good to check to make sure they are no traps. Lol.

23.     On a text message dated August 6, 2021, the SUBJECT sent C.D. a news article

titled, "Apple Will Report Child Sexual Abuse Images on iCloud to Law Enforcement" to C.D.,

with the accompanying text:

> SUBJECT: You need to read this.
> C.D.: I read that last night…
> C.D.: I don't save images.
> SUBJECT: What about the cloud?
> C.D.: Nope.

24.     On text messages dated September 30, 2021, the following conversation occurred

between the SUBJECT and C.D. related to the SUBJECT's and C.D.'s interactions with minor

males at a local health club:[4]

> SUBJECT: Have you had any boy stories lately?
> C.D.:  Many
> SUBJECT: Ahhhh….do tell!!
> SUBJECT: Whirlpool is finally open in the Men's Locker Room in Bethesda. Saw a
> teenage boy in there last week.
> SUBJECT: Tell me about the boys.

25.     On text messages dated October 9, 2021, the conversation regarding interactions

with male minors at the local health club continued, as further described below:

> C.D.: Lots of teens here
> C.D.: Clearly the evening is the time to come here
> C.D.: I'm only ever here mornings during the week

---

[4] The names of the businesses have been redacted in the text messages described herein, and the businesses will be referred to generally based on the type of business.

SUBJECT: Are teens in the locker room and sauna and showers?
C.D.:  Nope
C.D.: Also: the gym just closed
C.D.: Wow…Sunday is clearly the day I should come here every week
SUBJECT: Why?
SUBJECT: I'm at the Redskins game now.
C.D.: There are teens and preteens everywhere
SUBJECT: Yum!!!
C.D.: All [*Playing*] Tennis
SUBJECT: I wish you could get pics!

26.    On text messages dated December 19, 2021, the SUBJECT and C.D.'s

conversation regarding interactions with male minors at the local health club continued:

SUBJECT: Where did you take the boy?
SUBJECT: [*Sends unknown attachment*] I did this boy from the hot tub at [*name of local health club*]
SUBJECT: [*Sends unknown attachment*]
SUBJECT: The 14 year old boy was back in the hot tub last night from the week before. I talked to him a little bit.  He said he was there by himself and took the bus home by himself.
*C.D.:*  You "did" him?
SUBJECT: I had sex with XXXX. I took him home with me from [name of local health club]
SUBJECT: The 14 year old boy, I will work on next time.
C.D.: How old was XXXX
SUBJECT: XXXX is 28, but looks very young.
SUBJECT: He came twice.
C.D.: I came 12 times yesterday
C.D.: New material I found on Kik
SUBJECT:  Are you serious?? 12 times??
C.D.: Yes…My Willie was hurting when I tried once this morning lol
SUBJECT:  Can I see the new material you found on kik?
C.D.: Friend me on my new account on mega
*C.D.:* [*Sends Mega link*]
SUBJECT: Did you see my friend request?
C.D.: Sent it to you
SUBJECT: Got it.
C.D.: Enjoy
SUBJECT: Thanks

27.     On text messages dated March 7, 2022, the text conversation continued during
which the SUBJECT sent the following to C.D. related to the SUBJECT's interaction at the local
health club:

> SUBJECT: Just left [*name of local health club*]. There was a local 12 year old boy in the
> hot tub with his Father.  Just hit puberty about 4 months ago.  He had a few public hairs
> on his crotch. No hair anywhere else on his body. I think they were either Russian or
> Eastern European.

28.     On text messages dated March 30, 2022, the text conversations continued
between the SUBJECT and C.D. related to Mega:

> C.D.: Wow
> C.D.: This was a great set
> C.D.: One of the best
> SUBJECT: What are you talking about?
> C.D.: Look on mega
> SUBJECT: Oh, yeah! They are great!

29.     On text messages dated February 6, 2023, the following text conversation
occurred following C.D. sending a Mega link to the SUBJECT:

> C.D.: [*Sends Mega link*]
> SUBJECT: Wow! He's HOT!!
> SUBJECT: Where does he live?
> C.D.: Boston
> SUBJECT: Is that a video of you jacking off your cock while wearing rainbow socks?
> C.D.: Yep
> C.D.: So much cum

30.     Shortly after, on text messages dated February 11, 2023, the conversation
continued regarding additional videos C.D. sent to the SUBJECT:

> C.D.:  Sent you a new video too
> SUBJECT: Ok.
> SUBJECT: Great videos. Thanks for sending them.
> C.D.: Instagram is even better than the mega videos
> C.D.: Direct access to these kids
> SUBJECT: Yeah, these kids LOVE Instagram, lol.
> C.D.: No parents even monitoring
> SUBJECT: Is this kid in Mexico?

C.D.: Yes

31.     On text messages dated March 15, 2023, C.D. and the SUBJECT again discussed

additional videos C.D. sent to the SUBJECT:

> C.D.: Sent you some videos
> C.D.: On mega
> SUBJECT: I saw them. Thanks.
> C.D.: Unfortunately – my Instagram account got shut down mid-way through our
> conversation – we were finally in the trust stage – he was finally sending me videos
> C.D.: And the person right before that I was chatting to kept asking me for my facepic
> then second later he was no longer there – likely blocked me and reported me.

32.     On text messages dated July 2, 2023, the SUBJECT messaged C.D. regarding an

interaction at the previously mentioned local health club:

> SUBJECT: So…..I was just sitting in the hot tub at [*name of local health club*] naked
> with the high school football player, who was also naked, talking for 30 minutes. Lol.
> SUBJECT: He ended up giving me his phone number.
> C.D.: Why?
> SUBJECT: Because I like him. And we had a good conversation. And he seemed to like
> talking to me. And he is a virgin.
> SUBJECT:  Why not?

33.     On text messages dated July 4, 2023, a brief text exchange occurred regarding a

mutual acquaintance, and then continued with the previous July 2, 2023 topic, as shown below:

> SUBJECT: He told me that he is a virgin.
> C.D.: How did that conversation come up though?
> SUBJECT: What were you doing at a diner in Bethesda?
> C.D.: I go every Tuesday morning after rescue squad
> C.D.: I'm at regency right now. Quite a few cuties here.
> SUBJECT: I asked him if he had a girlfriend, and he said, "no." Then he said that he has
> never had a girlfriend.  Then, I asked him if he had ever had sex before, which he
> sheepishly re[p]lied, "no" to.
> SUBJECT: I will be at Regency at 2pm.
> SUBJECT:  How long will you be there?
> C.D.: Probably till 11
> C.D.: Did you ask if he'd had a bf?
> C.D.: Going to [*name of local spa*] at 5
> C.D.: Wanna join?
> SUBJECT: Will I get to see you naked?
> C.D.: Yep

SUBJECT: Will I be able to play with your little wee-wee?

34.    On text messages dated September 9, 2024, and September 10, 2024, the following text exchange occurred between the SUBJECT and C.D.:

SUBJECT: victorblythe1@gmail.com
C.D.: I sent you something nice in Mega to have a look at
SUBJECT: Ok. Thanks.

## *Identification of Subject*

35.    AT&T was identified as the service provider for the telephone number utilized to communicate with C.D., 202-276-XXXX. In response to legal process, AT&T reported the SUBJECT as the subscriber of the account associated with telephone number 202-276-XXXX. The subscriber address associated with the AT&T account is the SUBJECT's residence located in Washington, D.C.

36.    Legal process was issued to Google related to the email address the SUBJECT provided to C.D. via text message on September 9, 2024, victorblythe1@gmail.com.  In response, Google reported the SUBJECT as the subscriber of the victorblythe1@gmail.com email address and the address associated that Google email address is the SUBJECT's residence.

37.    According to open-source research, SUBJECT is a licensed clinical social worker who specializes in the mental health field, specifically working with children and adolescents. The SUBJECT previously spent seven years in the Psychiatry department at Children's National Medical Center in Washington, DC.

## *Execution of Search Warrant*

38.    On August 11, 2025, the District of Columbia District Court Magistrate Judge Moxila Upadhyaya issued a search warrant to search the SUBJECT's residence located at XXXX Sycamore Street NW, Washington, District Columbia.  During the execution of the

search, two individuals were identified within the premises, the SUBJECT, and the SUBJECT's

relative.

39.    Law enforcement identified and conducted an on-scene preview of several digital

devices, to include a yellow iPhone with the SUBJECT's identifiers within the phone.  During

this on-scene preview, law enforcement identified several images and videos depicting child

pornography, to include the media within the above-described text messages with C.D., dated

November 8, 2019, as detailed below:

> SUBJECT: I'm 55, and it can be really difficult to maintain an erection with someone, even a hot 12 year old on the cusp of puberty! [*winking emoji*]
> SUBJECT: [*sends photograph depicting child pornography*]
> C.D.: Old photo
> C.D.: Which I sent to you
> SUBJECT: I know! [*winking emoji*]
> SUBJECT: Thought I'd give you a little inspiration.

40.    The image the SUBJECT sent to C.D. depicted two prepubescent males, with one

minor male anally penetrating the other minor male.  The other minor male has an erection and is

sitting on the first minor male.  This image was sent after SUBJECT stated, "I'm 55, and it can

be really difficult to maintain an erection with someone, even a hot 12 year old on the cusp of

puberty!"

41.    With a hidden folder within the iPhone, a thirty minute and 28 second video was

identified depicting child pornography.   The introduction to the video begins with the following

text, which has been abbreviated below: "13yo Seth from US fucks with his step brother and lets

me watch it one summer night…"  The video consists of two pubescent boys engaged in various

sexual acts, to include inserting their penises into each other mouths, as well as engaging in anal

intercourse.

42.     Within the "favorites" of the aforementioned iPhone's camera roll, another image was identified, depicting an adult male inserting his erect penis into an infant's anus.

43.     In addition to that iPhone, law enforcement also seized a Samsung storage device, a laptop, and a second iPhone.  The search of those devices is ongoing.  However, presently, law enforcement has identified over 300 videos that contain CSAM and an additional 85 videos that contain child exploitative material, but the age of the subjects cannot be determined.  Law enforcement has identified a total of 260,000 images on the phone and has not yet determined how many of these images contain CSAM or child exploitative material.  Law enforcement also found that the SUBJECT had repeated logins to his Mega account, which is one of the mediums through which C.D. is suspected to have sent the SUBJECT CSAM, as discussed above.

*Target Accounts*

**The iCloud account associated with vicstoy@aol.com**

44.     During law enforcement review of the yellow Apple iPhone seized during the execution of the search warrant, vicstoy@aol.com was observed as the Apple ID. Additionally, legal process was issued to Apple related to the iCloud account associated with vicstoy@aol.com.  In response, Apple reported the SUBJECT as the subscriber of the iCloud account associated with vicstoy@aol.com and the address associated with the iCloud account associated with vicstoy@aol.com address was the SUBJECT's residence.

**victorblythe1@gmail.com**

45.     As discussed in paragraphs 34 and 36, *supra*, I believe victorblythe1@gmail.com was used to set up a Mega account that the SUBJECT appears to have used to trade sexually explicit images of children.

vrblythe@aol.com; vicstoy@aol.com

46.     Mega provided the FBI with the account information for the users who generated the links sent by C.D.  to the SUBJECT.  One link belonged to account jamesfoxxx39@gmail.com, and another link belonged to account jamesfoxxxx39@yahoo.com. The e-mail account vrblythe@aol.com is listed as a contact for both of those Mega accounts. Yahoo Inc. provided records for vrblythe@aol.com which listed the user's name as Victor Blythe and a phone number of 202-276-XXXX, verified on April 9, 2025.

47.     Further, on October 3, 2019, the SUBJECT stated, in reference to a Mega account, to C.D. that he "created an account.  My e-mail address is: vicstoy@aol.com.  My name is: Victor Renato."  C.D. then said he sent the SUBJECT a friend link and then listed his Mega account link.

## CHARACTERISTICS OF INDIVIDUALS WHO COMMIT CHILD SEX ABUSE OFFENSES AND CHILD PORNOGRAPHY OFFENSES

48.     The information set forth in this Affidavit indicates that BLYTHE has a sexual interest in children and in sexually explicit images and videos of children. Based on participation in investigations of child sexual abuse and child pornography offenses and based on discussions with agents who have investigated child pornography and child sexual abuse cases, I have learned that individuals who possess or traffic in child pornography are often individuals who have a sexual interest in children and in images of children. There are certain characteristics common to such individuals, including the following:

   a.  Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children, from fantasies they may have viewing children engaged in sexual activity or in sexually

suggestive poses (such as in person, in photographs, or other visual media), or from literature describing such activity.

b.  Such individuals may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Such individuals oftentimes use these materials for their own sexual arousal and gratification. They may also use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts. With the development of technology, digital devices including laptops, tablets, and smart cellular phones are used to search for, access, download, possess, receive and distribute these materials.

c.  Individuals who have a sexual interest in children or images of children frequently maintain copies of child pornographic material in the privacy and security of their home or some other secure location. Frequently, these images and videos are kept on handheld mobile computing devices, like tablets, laptops, and cellular phones. These are commonly kept close to the individual who owns them, either on their person or at their residence. These items are commonly found during the execution of residential search warrants.

d.  Likewise, such individuals often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer or mobile computing devices, including smartphones and tablets. These collections are often maintained for several years and are kept close by, usually at the individual's residence, or on the individual's person, to enable the individual to

view the collection, at any time. These individuals often take steps to ensure that other individuals, who do not share their sexual interest in children, cannot access these devices and discover what is contained therein.

e.  Due to the accessibility and availability of child pornography on the Internet, in your affiant's recent experience, instead of maintaining collections, some such individuals engage in a pattern of viewing or downloading child pornography online and then deleting the material. This conduct also usually occurs at the individual's residence or some other secure location. It is also not uncommon for offenders to commit child pornography violations using only mobile computing devices, such as smart phones and tablets or for these individuals to store these materials in a cloud/online storage account in an effort to avoid law enforcement detection.

f.  Such individuals also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. Such items are commonly found on these individuals mobile computing devices.

g.  Such individuals prefer not to be without access to child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

## BACKGROUND CONCERNING PROVIDER ACCOUNTS

49.    PROVIDER ONE is the provider of the internet-based account identified by the iCloud account associated with vicstoy@aol.com.

50.    PROVIDER TWO is the provider of the internet-based account identified by victorblythe1@gmail.com.

51.    PROVIDER THREE is the provider of the internet-based accounts identified by vicstoy@aol.com and vrblythe@aol.com.

52.    Each of these PROVIDERS provides its subscribers internet-based accounts that allow them to send, receive, and store emails online. PROVIDER accounts are often typically identified by a single username, which serves as the subscriber's default email address, but which can also function as a subscriber's username for other PROVIDER services, such as instant messages and remote photo or file storage.

53.    Based on my training and experience, I know that each PROVIDER allows subscribers to obtain accounts by registering on each PROVIDER's website. During the registration process, each PROVIDER asks subscribers to create a username and password, and to provide basic personal information such as a name, an alternate email address for backup purposes, a phone number, and in some cases a means of payment.

54.    Once a subscriber has registered an account, each PROVIDER provides email services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. PROVIDER subscribers can also use that same username or account in connection with other services provided by each PROVIDER.[5]

---

[5] Here, the PROVIDER services for Apple Inc. may include iMessage (instant messages); FaceTime (video calls); iCloud, a file hosting, storage, and sharing service, which allows users to store, access, share, and

55.     In general, user-generated content (such as email) that is written using, stored on, sent from, or sent to a PROVIDER account can be permanently stored in connection with that account, unless the subscriber deletes the material. For example, if the subscriber does not delete an email, the email can remain on each PROVIDER's servers indefinitely. Even if the subscriber deletes the email, it may continue to exist on each PROVIDER's servers for a certain period of time.

56.     Thus, a subscriber's PROVIDER account can be used not only for email but also for other types of electronic communication, including, but not limited to: instant messaging, photo and video sharing; voice calls, video chats, SMS text messaging; or social networking. Depending

---

synchronize data across various digital devices, for example iCloud Photo Library and My Photo Stream for images and videos, iCloud Drive for documents, including presentations and spreadsheets, iCloud Tabs for synchronizing webpages, iWorks Apps (a suite of productivity apps), and iCloud Keychain (to store various usernames and passwords, credit card information, and Wi-Fi network information); Game Center (Apple's social gaming network, which allows users of Apple devices to play and share games with each other); Find My iPhone (remote location tracking and access to devices); Location Services (which allows apps and websites to access and use information about a user's approximate location); Apple Pay (which allows users to store credit, debit, or other payment card information, make purchases at Apple Store locations or through Apple.com, and make contactless payments at accepting merchants); and App Store and iTunes Store (which allow users to purchase and download digital content, *e.g.*, applications).

For Google LLC, the services may include include electronic communication services such as Gmail (electronic mail), Google Voice (voice calls, voicemail, and SMS text messaging), Chat (instant messaging and video chats, previously called Hangouts), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); Android (operating system); and Google Play (which allow users to purchase and download digital content, e.g., applications).

For Yahoo, Inc., Yahoo provides email, contact list, notes, chat, and other services as noted generically above. It provides the branded services Yahoo! groups (a listserv and bulletin board service, which users can opt into), and Yahoo! Messenger (an instant messaging service, which users can opt into). Yahoo does not currently provide a standalone document storage service, but its smartphone application has designated "documents" functions that operate through Yahoo's email storage.

on user settings, user-generated content derived from many of these services is normally stored on each PROVIDER's servers until deleted by the subscriber. Similar to emails, such user-generated content can remain on each PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on each PROVIDER's servers for a certain period of time. Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on each PROVIDER's servers. Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber. Based on my training and experience, I know that the types of data discussed above can include records and communications that can constitute evidence of criminal activity.

57.     Based on my training and experience, I know that providers such as each PROVIDER also collect and maintain information about their subscribers, including information about their use of PROVIDER services. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. Providers such as each PROVIDER also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, providers such as each PROVIDER

typically collect and maintain location data related to subscriber's use of PROVIDER services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

58.     Based on my training and experience, I know that providers such as each PROVIDER also often collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDERS in order to track what devices are using each PROVIDER's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

59.     Each PROVIDER also may allow its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices. This application is associated with the subscriber's PROVIDER account. In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the

device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as each PROVIDER) to locate the device on which the application is installed. After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider. Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device). To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s). Accordingly, the computers of PROVIDERS are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

60.     Based on my training and experience, I know that providers such as each PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to each PROVIDER. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by providers such as PROVIDERS may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same

user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

61.     Based on my training and experience, I know that each PROVIDER typically maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common email addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

62.     Based on my training and experience, I know that subscribers can communicate directly with each PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers such as each PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

63.     In summary, based on my training and experience in this context, I believe that the computers of each PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved email for PROVIDER subscribers), as well as PROVIDER-generated information about subscribers and their use of PROVIDER services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can

be used to identify the account's user or users. In fact, even if subscribers provide PROVIDERS with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

64.      As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with each PROVIDER account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by each PROVIDER can show how and when the account was accessed or used. For example, providers such as each PROVIDER typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in each PROVIDER account

may indicate its user's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).[6]

65.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber. This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group. In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation. This is true for at least two reasons. First, people that commit crimes involving electronic accounts (*e.g.*, email accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime. Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time. That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced. Finally, because email accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence

---

[6] At times, internet services providers such as PROVIDERS can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDERS' services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

66.    In this case, I seek this electronic information because the information connected to the use of the Provider account(s) may lead to the discovery of additional evidence, including but not limited to further evidence related to his interest in the sexual abuse of children or images of child pornography.  Your affiant believes that a search of the identified Apple iCloud account and e-mail accounts will lead to the recovery of evidence that the SUBJECT engaged in the distribution, possession, production, receipt, and/or transportation of child pornography.

## **CONCLUSION**

67.    Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDERS, who will then compile the requested records at a time convenient to them, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

_____
Blake Frohnapfel
Special Agent
Federal Bureau of Investigation


Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) by telephone on August 29, 2025



_____
G. Michael Harvey
UNITED STATES MAGISTRATE JUDGE

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER. The attached records consist of:

_____
[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.       all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.       such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.       the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.       the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                                      Signature